UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TONEY A. WHITE, III, | Case No. 2:21-cv-01259-RFB-VCF |
| Plaintiff, | **ORDER SCREENING SECOND AMENDED COMPLAINT AND RESOLVING SOME PENDING MOTIONS** |
| v. | |
| JEREMY BEAN, et al., | |
| Defendants. | (ECF Nos. 5, 6, 7, 8, 9, 19, 25, 29, 30, 31). |

Plaintiff Toney White, III, who is incarcerated in the custody of the Nevada Department of Corrections ("NDOC"), has submitted a Second Amended Complaint under 42 U.S.C. § 1983 in this removed action, contending that his civil rights were violated while he was detained at Clark County Detention Center ("CCDC") and incarcerated at High Desert State Prison ("HDSP") and Ely State Prison ("ESP"). (ECF No. 1-2). White also brings claims under state law. (Id.) After removal, White filed motions seeking various forms of relief from the Court. (See generally Docket). The Court now screens White's Second Amended Complaint under 28 U.S.C. § 1915A and resolves some of his pending motions.

I.     **SCREENING STANDARD**

Federal courts must conduct a preliminary screening in any case in which an incarcerated person seeks redress from a governmental entity or officer or employee of a governmental entity. See 28 U.S.C. § 1915A(a). In its review, the Court must identify any cognizable claims and dismiss any claims that are frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief from a defendant who is immune from such relief. See Id. §§ 1915A(b)(1), (2). Pro se pleadings, however, must be liberally construed. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United

States; and (2) that the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

In addition to the screening requirements under § 1915A, under the Prison Litigation Reform Act ("PLRA"), a federal court must dismiss an incarcerated person's claim if "the allegation of poverty is untrue" or if the action "is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2). Dismissal of a complaint for failure to state a claim upon which relief can be granted is provided for in Federal Rule of Civil Procedure 12(b)(6), and the Court applies the same standard under § 1915 when reviewing the adequacy of a complaint or an amended complaint. When a court dismisses a complaint under § 1915(e), the plaintiff should be given leave to amend the complaint with directions as to curing its deficiencies, unless it is clear from the face of the complaint that the deficiencies could not be cured by amendment. Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995).

Review under Rule 12(b)(6) is essentially a ruling on a question of law. See Chappel v. Lab. Corp. of Am., 232 F.3d 719, 723 (9th Cir. 2000). Dismissal for failure to state a claim is proper only if the plaintiff clearly cannot prove any set of facts in support of the claim that would entitle him or her to relief. Id. at 723–24. In making this determination, the Court takes as true all allegations of material fact stated in the complaint, and the Court construes them in the light most favorable to the plaintiff. Warshaw v. Xoma Corp., 74 F.3d 955, 957 (9th Cir. 1996). Allegations of a *pro se* complainant are held to less stringent standards than formal pleadings drafted by lawyers. Hughes v. Rowe, 449 U.S. 5, 9 (1980). While the standard under Rule 12(b)(6) does not require detailed factual allegations, a plaintiff must provide more than mere labels and conclusions. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). A formulaic recitation of the elements of a cause of action is insufficient. Id.

Additionally, a reviewing court should "begin by identifying pleadings [allegations] that, because they are no more than mere conclusions, are not entitled to the assumption of truth." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported with factual allegations." Id. "When there are well-pleaded

1    factual allegations, a court should assume their veracity and then determine whether they plausibly

2    give rise to an entitlement to relief." Id. "Determining whether a complaint states a plausible claim

3    for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial

4    experience and common sense." Id.

5        Finally, all or part of a complaint filed by an incarcerated person may be dismissed *sua*

6    *sponte* if that person's claims lack an arguable basis either in law or in fact. This includes claims

7    based on legal conclusions that are untenable—like claims against defendants who are immune

8    from suit or claims of infringement of a legal interest that clearly does not exist—as well as claims

9    based on fanciful factual allegations like fantastic or delusional scenarios. Neitzke v. Williams,

10   490 U.S. 319, 327–28 (1989).

11   **II.    FACTUAL BACKGROUND**

12       In his Second Amended Complaint, White sues 29 Defendants and 50 Doe defendants for

13   events that took place while he was detained at CCDC and incarcerated at HDSP and ESP. (ECF

14   No. 1-2 at 4–33). White brings nine claims and seeks declaratory, injunctive, and monetary

15   (compensatory, nominal, and punitive) relief. (Id. at 34–42). The Court begins by summarizing

16   White's lengthy factual allegations, which it divides into three subjects.

17       **A.    Medical care**

18       White alleges the following. He was in a car accident in 1989 that caused severe head

19   trauma and left him with life-long seizures. (Id. at 7). White's seizures were largely controlled

20   with an 1,800 milligram ("mg") dose of Gabapentin given twice a day for a daily total of 3,600

21   mg of that anticonvulsant drug. (Id. at 8). This course of treatment was prescribed for White by

22   Celia H. Chang, M.D., a neurologist at U.C. Davis, and by neurologist Miracle Wangswana, D.O.,

23   in July 2004 and March 2018. (Id.) It is unclear from the allegations if White saw both doctors on

24   both dates or one doctor earlier and the other later and, if the latter, which doctor on which date.

25       White was diagnosed with a Coccidiomycosis fungal infection in his left wrist in August

26   2007. (Id. at 7). He had five surgeries to correct the condition and was placed on the antifungal

27   medication Diflucan indefinitely to prevent a relapse, which could be fatal. (Id.) White's seizures

28

1   and fungal infection are considered chronic conditions under the NDOC's administrative

2   regulations. (Id.)

3        White was arrested and detained at CCDC pending trial. (See id. at 7). On July 31 and

4   August 1, 4, and 14, 2017, when White was detained at CCDC, Naphcare, Inc., Drs. Larry

5   Williamson and Holly Crosby, registered nurses Larry Hall and Rhys Lim, and physician's

6   assistant Eric Lopez all noted in White's medical records that he had been discovered diverting his

7   Gabapentin medication to other prisoners. (Id. at 7). Plaintiff alleges that these accusations were

8   false. (Id.) The notes state that White had been "hoarding/cheeking" and otherwise "not consuming

9   his medications" and forging medical documents. (Id. at 40). White's Gabapentin medication was

10  discontinued while he was detained at CCDC because of these medical notes. (Id. at 7).

11         **1.**     **Transfer to HDSP in March 2019**

12       White alleges that one year and seven months he was transferred from CCDC to HDSP on

13  March 14, 2019. (Id. at 9). At the time of transfer, White's property included a hand brace for his

14  left wrist (used because of the fungal infection) and 4 compact disks ("CDs") containing evidence

15  for a different federal civil case that he was litigating in this District. (Id.) Correctional officer R.

16  Clay required White to remove the brace to be cuffed for transfer to HDSP. (Id.) White told Clay

17  that the brace was a medical necessity and asked Clay to cuff him over the brace. (Id.) Clay

18  declined, citing policy, and cuffed White without his brace. (Id.) White's CDs and hand brace were

19  inventoried and supposedly placed with his other property. (Id.) The 45-minute ride from CCDC

20  to HDSP caused White "excruciating" pain in his left wrist. (Id.)

21       During medical intake at HDSP, White reported his medical conditions, including his need

22  for a hand brace and Diflucan to treat his fungal infection and Gabapentin to treat his seizure

23  condition. (Id.) "A[n] order for seizure intake protocol was placed" on White and he was given a

24  lower bunk. (Id.) But White wasn't given his medical device or medications; so he repeatedly filed

25  medical kites and grievances about this issue. (Id.) White saw Dr. T. Manalang on April 10, 2019,

26  to discuss his complaints and treatment plan. (Id. at 10). White expressed his need for Diflucan

27  and a hand brace to treat his fungal infection and Gabapentin to treat his seizures. (Id.) White

28

1   reported that he had increased seizure activity because he was prescribed only Keppra to treat that
2   condition; he needed Keppra and Gabapentin to successfully manage his seizures. (Id.)

3       Dr. Manalang enrolled White as a chronic-care patient. (Id.) Despite the policy providing
4   that those prisoners are not to be charged for medical appointments concerning their chronic
5   conditions, White was charged for those appointments. (Id.) Dr. Manalang did not prescribe
6   Diflucan, Gabapentin, or a hand brace for White. (Id.) Dr. Manalang noted that there were no
7   reports of seizures in White's medical records. (Id.) White explained that he did not call "man
8   downs" so staff could witness his seizures because they cost too much. (Id.)

9       White was placed in administrative segregation in April 2019 where he constantly endured
10  painful cuffing over his left wrist to do things like recreation, showering, medical appointments,
11  and visits. (Id.) White continued to issue grievances about the pain until he received a replacement
12  wrist brace on July 31, 2019. (Id.) When White saw Dr. G. Bryan on June 26, 2019, he complained
13  about the need for a brace and Diflucan due to a painful fungal reinfection in his left wrist and
14  Gabapentin medication to treat his continuing seizures. (Id. at 11). Dr. Bryan noted White's
15  concerns but did not prescribe him the medications and device he sought. (Id.) Around this time,
16  White submitted medical kites and grievances seeking to be seen by a neurologist and infectious
17  disease expert. (Id.)

**2.      First seizure in HDSP on July 20, 2019**

19      White had a seizure on July 20, 2019, and submitted a medical kite about it the next day.
20  (Id.) White saw Dr. Bryan on July 31, 2019. (Id.) Dr. Bryan, "viewing [the] mounting infection in
21  [White's] left wrist[,]" ordered and provided White a wrist brace. (Id.) Despite White's report that
22  he had a seizure, Dr. Bryan refused to prescribe Gabapentin for two reasons: (1) White's medical
23  reports stated that he had been caught diverting his medication to other inmates and (2) White
24  claimed that he was allergic to other medications used to treat seizures. (Id.) Instead, Dr. Bryan
25  ordered that White's blood-serum levels be checked if he reports a seizure. (Id.) Dr. Bryan
26  explained that White would not be prescribed Gabapentin unless staff witnessed him having a
27  seizure. (Id.)

28

5

### 3.      Second seizure 14 days later; receives Gabapentin

White had a seizure on August 4, 2019, that was witnessed by other inmates and prison staff. (Id.) White was taken to the clinic and his blood was checked. (Id.) A nurse practitioner told White that because he had suffered a serious seizure, he would be prescribed Gabapentin. (Id. at 12). White had a seizure he labels "violent" four days later that was witnessed by staff. (Id.) He had not yet received Gabapentin. (Id.) White was examined by Dr. Manalang and immediately given Gabapentin. (Id.) Dr. Manalang also ordered White's blood-serum levels to be checked in two weeks. (Id.)

### 4.      Third seizure 13 days later; Gabapentin dose increased

White had a seizure on August 17, 2019, and submitted a medical kite. (Id.) White saw Dr. Manalang four days later, who increased the Gabapentin dosage to 1,200 mg to be taken by mouth twice a day. (Id.) Dr. Manalang ordered a follow up in 90 days and, "[a]fter observing the severity of [White's] left wrist infection," ordered him Diflucan. (Id.) White was transferred to ESP a week later; the follow-up that Dr. Manalang ordered did not happen. (Id.)

### 5.      Transfer to ESP on August 24, 2019; Gabapentin dose lowered

White was cuffed without the wrist brace for the five-to-seven-hour ride from HDSP to ESP, which was "excruciatingly painful." (Id.) Once at ESP, White's keep on person ("KOP") medications and wrist brace were given to medical staff, but White received his KOPs on August 31, 2019. (Id.) White did not receive his seizure mediations on September 4 and 5, 2019, and had a seizure. (Id.) White and his mother both submitted complaints about this incident. (Id.) White received his seizure mediations in the evening on September 6, 2019. (Id.) But his Gabapentin dosage was reduced to 900 mg taken twice a day. (Id.) White submitted a grievance about the reduced Gabapentin dose and included documents about his prior neurological consults with Drs. Chang and Wangswana. (Id.)

### 6.     Martin prescribes Gabapentin at 1,200 to 1,500 mg BID

White received his brace on September 10, 2019. (Id.) He saw nurse practitioner Greg Martin[1] via telemed on September 17, 2019, who prescribed Gabapentin at a dose of 1,200 to 1,500 mg to be taken twice daily ("BID"). (Id.) The prescription was for a year. (Id.) Martin ordered White to have a follow-up appointment with Dr. T. Hanf for his fungal infection and discontinued White's prescription for Keppra because White was refusing to take it. (Id. at 13). White did not receive the Gabapentin as Martin prescribed. (Id.)

### 7.     Higher dose of Gabapentin denied by Martin's superiors

Two days later, Dr. Hanf and ESP's Director of Nursing G. Carpenter told White that he was denied the increased dosage of Gabapentin that Martin had prescribed under the policy that a prisoner needed an order from a neurologist to receive a higher dose of Gabapentin. (Id.) So White submitted Drs. Chang's and Wangswana's reports to Dr. Hanf and nurse Carpenter to appeal that decision. (Id.) Dr. Hanf recommended that White receive a consult from a hand surgeon for the fungal infection in his wrist. (Id.)

### 8.     URP approves referral to hand surgeon for fungal infection

The Utilization Review Panel ("URP") approved Dr. Hanf's recommendation for a surgical consult a week later. White submitted records from his visits with Dr. Chukwudum Uche, who specializes in infectious diseases, to Carpenter and Dr. Hanf. (Id.) It appears that White saw Dr. Chukwudum before he had been detained or incarcerated. (See id.) Although a hand surgeon consolation was approved in September 2019, no actual consultation happened before White filed his Second Amended Complaint a year later. (Id. at 25).

### 9.     Referral to neurologist approved by URP

White had seizure on October 2, 2019, and submitted a medical kite about it. (Id.) White saw Dr. Hanf and nurse Carpenter nine days later who told him that NDOC Medical Director Michael Minev, NDOC Chief of Nursing Theresa Wickham, and NDOC Medical Administrator Robin Hager denied Martin's order that White receive Gabapentin in dosages between 1,200 to

---

[1] White does not name Greg Martin as a defendant in this action (ECF No. 1-2 at 4–7), and the Court does not construe the Second Amended Complaint as alleging any claims against that person.

1,500 mg BID. (Id.) White needed to see a neurologist to gain approval for the dosage amount he sought to be prescribed. (Id.) Hanf recommended that White be referred to see a neurologist, which the URP approved. (Id.) White was advised that he also needed to be seen having a seizure by staff. (Id.)

### 10.   Transfer to HDSP on October 15, 2019

White had a seizure he labels "violent" on October 15, 2019, and was transferred back to HDSP the next day for trial. (Id.) Despite medical orders for White to be placed on the first tier and given a lower bunk, he was placed on the second tier. (Id.) White advised HDSP medical staff that he had over 300 pages of his medical history for them to copy. (Id. at 14) White also sought approval from the URP to see an outside neurologist to establish a treatment plan for his seizures. (Id.)

### 11.   Seizure; Gabapentin dose increased but lowered by superiors

White had a seizure he alleges was "terribly violent" on October 27, 2019, and was taken to the clinic to be evaluated; it took him 30 minutes to regain consciousness. (Id. at 14). White's Gabapentin prescription was increased from 900 mg twice daily to 1,600 mg twice daily. (Id.) Prison staff witnessed his seizure. (Id.) When White received his Gabapentin on October 29, 2019, it was 1,200 mg, not the 1,600 mg that had been prescribed. (Id.)

On November 4, 2019, White told HDSP's Director of Nursing Bob Faulkner that he had 300 pages of his medical history for staff to copy and ensure the continuity of his medical care. (Id.) The same day White's Gabapentin prescription was reduced to 900 mg to be taken twice daily. (Id.) Dr. Manalang told White on November 13, 2019, that he would correct the Gabapentin dosage. (Id.) Dr. Manalang also discontinued White's Keppra prescription based on White's complaints that it worsened his asthma. (Id.) And Dr. Manalang reminded White that he had a neurological consult pending. (Id.)

### 12.   Gabapentin dose lowered; Diflucan unofficially stopped

White alleges that from November 13 to December 6, 2019, he received 1,200 mg of Gabapentin twice daily. (Id.) But White also alleges that he did not receive his medication on December 2 and 6, 2019, because it was "out." (Id. at 15). White's Gabapentin prescription was

1   once again reduced to 900 mg to be taken twice daily. (Id.)  White did not receive Diflucan from

2   December 20, 2019, to February 11, 2020. (Id.)

### 13.   Neurologist prescribes Gabapentin dose at 1,200 TID

4   White had a seizure he labels "serious" on January 3, 2020. (Id. at 16). He injured his right

5   knee as a result. (Id.) A week later, White was evaluated by and consulted with neurologist Dr.

6   Evita K. Tan of Las Vegas Neurology Center. (Id.) Dr. Tan prescribed Gabapentin at a dose of

7   1,200 mg to be taken three times daily ("TID") for a total of 3,600 mg. (Id.) She also ordered blood

8   tests, an EEG (electroencephalogram), and an MRI (magnetic resonance imaging). (Id.)

### 14.   Medical staff overrides Dr. Tan's orders; White has 8 seizures

10   White concludes that Minev, Wickham, Hager, Faulkner, and Drs. Bryan and Manalang

11   refused to provide him the dosages of Gabapentin that Dr. Tan prescribed. (Id.) On January 24,

12   2020, White had a seizure that was witnessed by his cellmate who tried to summon staff but to no

13   avail. (Id.) White submitted a medical kite about this event. (Id.)

14   White submitted a medical kite on February 23, 2020, complaining of continued seizure

15   activity because he was undermedicated. (Id. at 19). Faulkner responded a month later, explaining

16   that nurses do not independently alter medical orders and concluded that White did not require a

17   visit or follow up. (Id.) White submitted a medical kite five days later with the same complaint.

18   (Id.) The response was the White is scheduled to see the provider and will be notified the day of

19   his appointment. (Id.)

20   White submitted a medical kite on March 2, 2020, again complaining that he was under

21   medicated. (Id.) Faulkner responded on March 25, 2020, that "dosages are determined by the

22   medical provider who makes any necessary dosage adjustments." (Id.) Faulkner concluded that

23   White did not require a visit or follow up. (Id.)

24   White had a seizure on March 8, 2020, and submitted a medical kite about it. (Id.) Faulkner

25   responded on March 25, 2020, to see his prior grievance response and concluded that White did

26   not require a visit or follow up. (Id.) White had a seizure on March 14, 2020, and submitted both

27   a medical kite and an emergency grievance about it. (Id.) Faulkner responded on March 25, 2020,

28

referring to his prior grievance response and concluded that White did not require a visit or follow up. (Id.)

White had a seizure on March 24, 2020, and submitted a medical kite about the event. (Id. at 20). Faulkner responded on March 25, 2020, to see his prior grievance response. (Id.) The next day Faulkner directed medical staff to collect the disk of medical records dating back to 1992 that White had repeatedly asked medical staff to retrieve and duplicate. (Id.)

White had a seizure he labels "violent" on March 27, 2020, that was witnessed by his cellmate and staff and caused incontinence. (Id.) White seized for 25 minutes before medical staff arrived. (Id.) He repeatedly and violently struck his head and face on the steel toilet and concrete floor during this time. (Id.) Once medical staff arrived, he left White in that state to make a phone call. (Id.) No treatment or monitoring was provided, and the doctor was not called. (Id.)

White had a seizure on March 31, 2020. (Id. at 21). He submitted a medical kite about the event and complained that his back hurt and he had a persistent headache from his seizure on March 27. (Id.) White also complained that his fungal infection worsened—he needed surgery to remove a fungal mass. (Id.) White had another seizure on April 8, 2020, and submitted a medical kite about the event. (Id.)

White had a seizure he labels "violent" on April 27, 2020, during which he struck his left elbow, causing "significant swelling and potential fracturing." (Id.) He filed a medical kite about the event. (Id.) When he heard no response by May 4, 2020, White submitted an emergency grievance. (Id.) Correctional officer Radek Dvorak rebuffed the emergency nature of the grievance and failed to contact medical staff. (Id.)

### 15. Dr. Bryan increases Gabapentin dose to 1,200 mg BID; White has 7 seizures

White had a seizure on May 12, 2020, and submitted a medical kite about the event. (Id.) White saw Dr. Bryan six days later, who increased his Gabapentin dose to 1,200 mg BID. (Id.) White received his first increased dose of Gabapentin the morning of May 22, 2020, but did not receive any Gabapentin that evening. (Id. at 22).

1   Because he still had not consulted with a hand surgeon, as the URP had approved, and his

2   untreated fungal infection worsened, on June 16, 2020, White attempted to remove the infected

3   material himself. (Id. at 23). On June 17, 2020, White was taken to Desert Radiology for the MRI

4   that Dr. Tan had ordered five months earlier. (Id.)

5   White had a seizure on June 21, 2020, and submitted a medical kite about the event. (Id.)

6   White had a seizure on June 29, 2020, and submitted a medical kite about the event. (Id.) White

7   had a seizure on July 6, 2020, and filed a medical kite about the event. (Id.) White had a seizure

8   on July 10, 2020, and filed a medical kite about the event. (Id.)

9   On July 15, 2020, White's blood was drawn for testing as ordered by Dr. Tan five months

10   earlier. (Id. at 24). White had a seizure on July 16, 2020, and filed a medical kite about the event.

11   (Id.) White had a seizure on July 25, 2020, and filed a medical kite about the event. (Id.) White

12   had a seizure on July 30, 2020, and filed a medical kite about the event. (Id. at 25). White's glasses

13   got damaged during this event (Id.)

14   **B.   Medical kites**

15   When White was transferred to a different unit at HDSP in December 2019, he noticed that

16   prisoners were required to place their medical kites into a unit drop box. (Id.) Medical staff were

17   to collect the kites daily. (Id.) White submitted medical kites on January 3, 10, 20, and 24, 2020.

18   (Id. at 17). Registered nurse Scott Mattinson's response stated that he received the grievances on

19   January 28, 2020. (Id.) White then sent medical kites seeking information about the identity of

20   staff members for litigation purposes. (Id.) Faulkner responded by identifying the NDOC's

21   Medical Director (Minev) and Chief of Nursing (Wickham). (Id. at 18).

22   When White asked why his medical kites from four dates in January 2020 were "falsely

23   post-dated as being received by Mattison on January 28, 2020," Faulkner responded, that staff

24   processes kites as they are received; medical staff determines whether an issue is truly an

25   emergency, and he would follow up with White about his placement on the appointment list. (Id.)

26   White discovered on July 30, 2020, that medical staff refused to timely retrieve medical kites

27   deposited in his unit's drop box. (Id. at 25).

28

**C.   Evidence for other actions**

White sent a kite to Curry in April 2019 asking to return the four evidentiary CDs and hand brace that Curry took when White was originally transported to HDSP. (Id. at 10). Curry denied taking White's brace but said that he had turned the CDs over to law librarians Sia Asimidakis and Jaques Graham in April 2019. (Id.) White sent a request to Asimidakis and Graham in July 2019 asking to review the CDs. (Id. at 11). He received no reply. (Id.)

Three months later, Asimidakis told White that she had vowed to lose two of White's disks and write him up on false charges of "gassing." (Id. at 14). White submitted grievances about this event. (Id.) Graham and Asimidakis continued to refuse to provide White his disks, and on December 24, 2019, cursed him out and said White needed to get approval from HDSP's Associate Warden Jennifer Nash to view the CDs. (Id. at 15). Asimidakis threatened to "fuck [White] over" if he even thought about filing a grievance about Asimidakis's behavior. (Id.) White submitted a grievance anyway. (Id. at 16).

White did not get to review the contents of the CDs before his deposition in the civil case that it pertained to. (Id.) He was therefore unable to substantiate his claims in that case with photographic evidence. (Id.) During White's library access in January 2020, Asimidakis threatened to have White placed in the hole for "PREA" if he continued harassing her about the two missing disks. (Id.)

White had another fight in the law library with Asimidakis in February 2020. (Id.) Asimidakis threatened to "cross" White out if he kept making a big deal about his missing evidentiary CDs. (Id.) Asimidakis submitted a false disciplinary report against White and White filed a grievance in response. (Id.)

On March 18, 2020, White received several video disks that had been produced by Las Vegas Metropolitan Police Department ("LVMPD") in discovery in his federal civil action. (Id. at 20). On April 13, 2020, White sent an urgent request to Asimidakis and Graham to review the disks that LVMPD supplied. (Id. at 21).

On July 1, 2020, White received medical records during discovery in his federal civil action. (Id. at 23). The records were confiscated by prison staff. (Id.) White repeatedly asked

1    Faulkner and correctional lieutenant Owens to return them. (Id. at 23–24). On July 27, 2020, White

2    was permitted to view this evidence and the disks that LVMPD provided. (Id. at 24).

3    **III.     SCREENING SECOND AMENDED COMPLAINT**

4            Based on these allegations, White contends that Defendants retaliated against him, were

5    deliberately indifferent to his serious medical needs, conspired to violate his civil rights, violated

6    protections provided him by the Americans with Disabilities Act ("ADA"), converted his property,

7    defamed him, and intentionally caused him emotional damage. (Id. at 34–42). The Court liberally

8    construes the Second Amended Complaint as bringing claims based on over a dozen different

9    theories of liability. The Court will address each theory and any related issue in turn.

10           **A.     Pleading Deficiencies**

11                   **1.     Pleadings must comply with Rules 8 and 10**

12           A complaint must contain "a short and plain statement of the claim showing that [White]

13   is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Each allegation must be simple, concise, and direct."

14   Fed. R. Civ. P. 8(d)(1). White is advised that, in accordance with Rule 8, a plaintiff may not allege

15   facts that are extraneous and not part of the factual basis for a particular claim. See Knapp v.

16   Hogan, 738 F.3d 1106, 1109 (9th Cir. 2013) (recognizing that Rule 8 can be violated when the

17   plaintiff says too much). A party must state its claims or defenses in numbered paragraphs, each

18   limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). "[E]ach claim

19   founded on a separate transaction or occurrence . . . must be stated in a separate count." Id.

20           The Second Amended Complaint is 42 pages long but Claim 1 does not begin until page

21   34. (ECF No. 1-2 at 34).[2] White alleges very few facts in any of the counts and instead refers to

22   the long statement of facts. White's claims are not limited to a single set of circumstances. For

23   example, Claim 1 alleges that four groups of defendants retaliated against in different ways. (Id.

24   at 34–35). Each circumstance should be pled as its own claim. The Court finds that the Second

25   Amended Complaint does not comply with Rules 8 and 10.

26

27

28
_____
        [2] White uses Roman numerals like I, II, and III to number his claims, but for clarity and
brevity the Court has converted them to Arabic numerals—1, 2, 3, etc.

### 2.      Pleadings also must comply with Rules 18 and 20

It also appears that White has not complied with applicable joinder rules. A basic lawsuit is a single claim against a single defendant. FRCP 18(a) allows a plaintiff to add multiple claims to the lawsuit when they are against the same defendant. FRCP 20(a)(2) allows a plaintiff to join multiple defendants to a lawsuit where the right to relief arises out of the same "transaction, occurrence, or series of transactions" and "any question of law or fact common to all defendants will arise in the action." **However, unrelated claims that involve different defendants must be brought in separate lawsuits**. See George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007).

This rule is not only intended to avoid confusion that arises out of bloated lawsuits, but also to ensure that inmates pay the required filing fees for their lawsuits and prevent inmates from circumventing the three strikes rule under the Prison Litigation Reform Act. 28 U.S.C. § 1915(g). Claims may **not** be joined merely because they occurred in the same prison or in the same county, the violators had the same supervisor, or the claims are based on the same type of constitutional violation, such as retaliation or allegedly cruel conditions of confinement. White may **not** evade these requirements merely by adding a defendant to a claim. White also may **not** evade these requirements by including multiple claims in a part of the complaint form reserved for one count.

White's allegations that medical staff were deliberately indifferent to his serious medical needs forms the heart of the Second Amended Complaint. Interspliced with White's medical-needs allegations are assertions that other defendants mishandled and wrongfully prevented him from accessing evidence for another civil lawsuit that he was pursuing in this District. But there is no thread uniting the allegations about evidence interference with White's allegations about his medical needs. This is not acceptable pleading.

The Court therefore dismisses White's claims about evidence interference without prejudice and without leave to amend. To be clear, this applies to **parts** of Claim 1, First Amendment retaliation; Claim 3, 42 U.S.C. § 1985 civil conspiracy; Claim 4, 42 U.S.C. § 1986 failure to prevent civil conspiracy; Claim 7, state-law defamation; Claim 8, state-law negligence; and Claim 9, state-law intentional infliction of emotional distress. And it applies to **all** of Claim 6, state-law conversion of property. If White wants to pursue claims about the subject of evidence

14

interference, he must bring them in a new action. Because there are no other allegations pled against them, Defendants Sia Asimidakis, Jaques Graham, Manuel Portillo, and Owens are dismissed from the Second Amended Complaint without prejudice and without leave to amend.

### 3.    Proper defendants in § 1983 suits

For each claim, White must allege facts sufficient to show that each specified defendant violated a specified constitutional right. Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead facts that would be sufficient to show that each Government-official defendant, **through the official's own individual actions**, has violated the Constitution. Ashcroft, 556 U.S. at 676. Thus, a defendant may not be held liable merely because that defendant holds a particular job or has particular responsibilities under state law or because that defendant's employees, subordinates, co-workers, or contractors violated White's constitutional rights. The Second Amended Complaint does not comply with this pleading standard.

For example, White concludes under Claim 1 that Williams, Hubbard-Pickett, Johnson, Nash, and Daniels, among others, "engaged in and willingly implemented, ratified, enforced, condoned, maintained or acquiesced in policies and actions of adverse natures on account of and related to [White's] engagement in protected First Amendment activities." (ECF No. 1-2 at 34). But he does not clearly allege what each Defendant did or failed to do, nor does he allege any facts that their alleged acts were "because of" White's "protected conduct" and "did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 568–69 (9th Cir. 2004) (outlining elements of a First Amendment retaliation claim). By alleging only bad acts that Defendants committed and not factually connecting them to his protected conduct, White has failed to allege that any Defendant personally participated in the constitutional deprivation.

### B.    Conclusory allegations of retaliation and conspiracy are not enough to state colorable claims or connect otherwise disparate claims.

White alleges under Claim 1 that four groups of defendants retaliated against him in violation of the First Amendment in numerous ways. To state a viable First Amendment retaliation claim in the prison context, a plaintiff must allege facts sufficient to show: "(1) a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and

1   that such action (4) chilled the inmate's exercise of her First Amendment rights, and (5) the action

2   did not reasonably advance a legitimate correctional goal." Rhodes, 408 F.3d at 567–68. Total

3   chilling is not required; the official's acts merely need to be the type that would chill or silence a

4   person of ordinary firmness from future First Amendment activities. Id. at 568–69.

5          Retaliation claims by prisoners must be evaluated considering concerns about "excessive

6   judicial involvement in day-to-day prison management, which 'often squander[s] judicial

7   resources with little offsetting benefit to anyone.'" Pratt v. Rowland, 65 F.3d 802, 807 (9th Cir.

8   1995) (quoting Sandin v. Conner, 515 U.S. 472, 482 (1995)). The prisoner also bears the burden

9   of pleading the absence of legitimate correctional goals for the conduct he complains about. Id. at

10  65 F.3d at 806. And the failure to respond effectively to grievances—including failing to respond

11  to grievances or rejecting them—is not sufficient to state a claim of retaliation for filing the

12  grievance. Stockton v. Tyson, No. 1:10-cv-00662-BAM PC, 2011 WL 5118456, at *2–3 (E.D.

13  Cal. Oct. 27, 2011); Allen v. Kernan, No. 3:16-cv-01923-CAB-JMA, 2017 WL 4518489, at *9

14  (S.D. Cal. Oct. 10, 2017).

15         General allegations about retaliation unconnected to a particular defendant are also

16  inadequate to state such a claim because a defendant is liable under 42 U.S.C. § 1983 "only upon

17  a showing of personal participation by the defendant." Taylor v. List, 880 F.2d 1040, 1045 (9th

18  Cir. 1989); Ashcroft, 556 U.S. at 676. So the plaintiff must paint a picture with facts showing that

19  **each defendant** was aware of the protected conduct and that the protected conduct gave each

20  defendant a retaliatory motive; mere speculation or general statements about intent are

21  insufficient—the plaintiff's allegations must show, not tell, that the actions were retaliatory. Pratt

22  v. Rowland, 65 F.3d 802, 808–09 (9th Cir. 1995). Retaliation is not established simply by showing

23  adverse activity after the occurrence of protected speech, but rather a plaintiff must show a causal

24  connection between the protected conduct and the defendant's action. Husky v. City of San Jose,

25  204 F.3d 893, 899 (9th Cir. 2000); Pratt, 65 F.3d at 808 (holding that "suspect timing" of inmate's

26  transfer to different prison, without more, insufficient to support inference that the transfer was

27  done in retaliation for inmate's exercise of First Amendment rights); accord Phillippi v. Patterson,

28

599 F. App'x 288, 289 (9th Cir. 2015). The Second Amended Complaint's allegations do not satisfy this standard.

For example, White concludes under Claim 1 that Minev, Williams, Faulkner, Gittre, Carpenter, Hanf, Hubbard-Pickett, Johnson, Hager, Asimidakis, Graham, Nash, Portillo, Bean, Mattison, Curry, and Daniels "engaged in and willingly implemented, ratified, enforced, condoned, maintained or acquiesced in policies and actions of adverse natures on account of and related to [White's] engagement in protected First Amendment activities." (ECF No. 1-2 at 34). And White alleges that he submitted numerous complaints about how his medical needs were not being adequately met. But White does not allege facts that each Defendant was aware of his complaints and acted because of them.

White alleges under Claim 3 that Defendants conspired to violate his civil rights in numerous ways in violation of 42 U.S.C. § 1985(2) and (3). White alleges under Claim 4 that some Defendants failed to prevent other Defendants from conspiring to violate his rights in numerous ways, in violation of 42 U.S.C. § 1986. To state a colorable claim of conspiracy to violate one's constitutional rights, "the plaintiff must state specific facts to support the existence of the claimed conspiracy." Burns v. Cnty. of King, 883 F.2d 819, 821 (9th Cir. 1989). What this means is that White must show "an agreement or meeting of the minds to violate [his] constitutional rights," and "[t]o be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." Crowe v. Cnty. of San Diego, 608 F.3d 406, 440 (9th Cir. 2010). The Second Amended Complaint's allegations do not satisfy this standard.

For example, White concludes under Claim 3 that "two or more defendants" "had meetings of the minds entering into express or implied tacit agreements with and/or between NDOC custody, medical, administrative and free staff" to deny White "the due course of justice and the truth in evidence" including falsifying medical records. (ECF No. 1-2 at 37). White similarly concludes under Claim 4 that "[e]ach defendant, having knowledge that (a) conspiracy(ies) was/were underway or /was/were about to be committed did nothing to prevent it/them but rather condoned, acquiesced in and ratified it/them." (Id.) But he does not allege facts to support these conclusions.

1   White also fails to allege facts that each Defendant shared the common objective of the conspiracy.

2   These pleading defects are fatal to both of White's conspiracy claims.

3      Because White's allegations of retaliation and conspiracy are conclusory, they fail to state

4   colorable claims for relief. These conclusory allegations also preclude the Court from finding that

5   all of White's several claims here constitute a serious of transactions or occurrences of retaliation

6   or conspiracy to violate his civil rights such that they can be pled in a single action. The Court

7   therefore dismisses Claim 1, First Amendment retaliation; Claim 3, civil conspiracy under

8   § 1985(2) and (3); and Claim 4, failure to prevent civil conspiracy under § 1986, without prejudice.

9   Because there are no other allegations against them, Defendants R. Curry; Brian E. Williams, Sr.;

10   Monique Hubbard-Pickett; Jeremy Bean; Calvin Johnson; Jennifer Nash; and Charles Daniels are

11   dismissed from the Second Amended Complaint without prejudice.

12      **C.   Discrimination under the ADA**

13      The Ninth Circuit has held that "the ADA prohibits discrimination because of disability,

14   not inadequate treatment for disability." Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1022

15   (9th Cir. 2010), overruled on other grounds by Castro v. Cnty. of Los Angeles, 833 F.3d 1060,

16   (9th Cir. 2016). Courts have held that "allowing prisoners to utilize the ADA . . . as causes of

17   action for not receiving medical treatment is simply making 'an end run around the Eighth

18   Amendment.'" King v. Calderwood, 2:13-cv-02080-GMN-PAL, 2015 WL 4937953, at *2 (D.

19   Nev. Aug. 19, 2015) (citing Deeds v. Bannister, 3:11-cv-00351-LRH-VPC, 2013 WL 1250343, at

20   *5 (D. Nev. Jan. 8, 2013)). Therefore, in the context of prison-medical services, to state a colorable

21   ADA claim at the screening stage, a plaintiff must allege more than a lack of adequate treatment

22   or negligence or deliberate indifference to serious medical needs; he must allege facts sufficient to

23   show that he was denied the benefits of the prison's medical services program because of his

24   disability. See Postawko v. Missouri Dep't of Corr., No. 2:16-cv-04219-NKL, 2017 WL 1968317,

25   at *12–13 (W.D. Mo. May 11, 2017); see also McNally v. Prison Health Servs., 46 F.Supp.2d 49,

26   58-59 (D. Me. 1999).

27      White alleges under Claim 5 that he has disabilities as defined by the ADA because he has

28   a chronic Coccidiomycosis fungal infection in his left wrist, his left wrist is immobile because of

that infection, and he has Epilepsy that causes seizures. (ECF No. 1-2 at 38). White concludes that because of his disabilities, he was denied or excluded from: (1) timely and therapeutic dosages of Gabapentin to treat his seizures, (2) a brace for his left wrist, (3) monitoring of his fungal infection and referral to an infectious disease specialist, (4) hand surgery to remove the fungal mass in his left wrist, (5) blood labs to monitor his conditions, and (6) timely provision of antifungal Diflucan medication. (Id.) But White pleads no facts to support these conclusions.

For example, White does not allege that prisoners with other conditions are prescribed Gabapentin without concern for the dosage. He does not allege that prisoners with other conditions do not need a specialist's order to be prescribed Gabapentin above a certain dosage. Nor does he allege that only prisoners who are prescribed Gabapentin or have seizure conditions fail to regularly or timely receive their medication. White's allegations about his fungal infection and wrist condition are similarly devoid of facts that he received different medical treatment because of either condition.

White has not stated a colorable claim that he was denied access to medical services because of his disabilities. White has merely pled that he did not receive adequate medical treatment for his disabilities. Such allegations are not actionable under the ADA, but instead fall under the Eighth Amendment because they potentially concern deliberate indifference to serious medical needs. Claim 5, discrimination under the ADA, is therefore dismissed without prejudice.

### D.    Fourteenth Amendment conditions-of-confinement

White contends under Claim 2 that various defendants were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. (ECF No. 1-1 at 35–36). "Inmates who sue prison officials for injuries suffered while in custody may do so under the Eighth Amendment's Cruel and Unusual Punishment Clause or, if not yet convicted, under the Fourteenth Amendment's Due Process Clause." Castro v. City of Los Angeles, 833 F.3d 1060, 1067–68 (9th Cir. 2016) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979) (holding that under the Due Process Clause, a detainee may not be punished prior to conviction). "Under both clauses, the plaintiff must show that the prison officials acted with "deliberate indifference." Id. The elements of a pretrial detainee's conditions-of-confinement claim are (1) "the defendant made an intentional

decision with respect to the conditions under which the plaintiff was confined;" (2) "those conditions put the plaintiff at substantial risk of suffering serious harm;" (3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) by not taking such measures, the defendant caused the plaintiff's injuries." Gordon v. Cnty. of Orange, 888 F.3d 1118, 1124–25 (9th Cir. 2018).

### 1. Clay

Based on the allegations, correctional officer Clay refused to cuff White over his wrist brace when he prepared White for transport from CCDC to HDSP, claiming that regulations precluded him from doing so. Clay acted despite White's statement that the brace was medically necessary. Clay declined, even though he was on notice based on Mr. White's statement that the brace was medically necessary, and cuffed White without his brace. While Mr. White does not specifically plead that Clay was present during the 45-minute transport, such an allegation is inferred from the Complaint for the purposes of the screening order. Accordingly, it is plausibly pled that R. Clay was deliberately indifferent to Plaintiff in this situation on this occasion. Therefore, the Fourteenth Amendment conditions of confinement claim in the Second Amended Complaint may proceed against Defendant R. Clay.

### 2. Naphcare Defendants

Based on the allegations, on four separate occasions in July and August 2017, Naphcare employees Williamson, Crosby, Hall, Lim, and Lopez entered reports in White's medical records that he had been caught diverting his Gabapentin medication to other inmates. (ECF No. 1-2 at 7, 40). This occurred while White was detained at CCDC. White contends that the accusations were not true. But White does not and cannot state a colorable claim under the Fourteenth Amendment for this conduct because there is no constitutional right to be free from false accusations or false charges. Garrott v. Glebe, 600 F. App'x 540, 541–42 (9th Cir. 2015) (unpublished) (collecting cases).

White's allegations about Naphcare suffer from another defect. The Court takes judicial notice that LVMPD, which is a political subdivision of the State of Nevada,[3] manages operations at CCDC. See Campopiano v. Gillespie, 2010 WL 2802723, at * (D. Nev. July 14, 2010) (citing Nev. Rev. Stat. § 280.284). It can be reasonably inferred that Naphcare is a private entity that contracted with LVMPD to provide medical and mental-health services to detainees at CCDC. "For purposes of claims brought under § 1983, a private entity like Naphcare is treated like a municipality and is subject to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1139 (9th Cir. 2012). To state a claim against a private entity under Monell, a plaintiff must show that (1) the private entity acted under color of state law and (2) if a constitutional violation occurred, it was caused by an official policy or custom of the private entity. Id.

The Court assumes that Naphcare was acting under color of state law when it provided medical services to detainees at CCDC. So the first element is satisfied for screening purposes. But White does not allege facts that the allegedly false reports were placed in his medical record because of an official policy or custom held by Naphcare. White has therefore failed to state a colorable claim against Naphcare. Because no other allegations are pled against it, Defendant Naphcare, Inc. is dismissed from the Second Amended Complaint without prejudice. And Claim 2, Fourteenth Amendment conditions of confinement, is dismissed without prejudice.

### E.    Eighth Amendment deliberate medical indifference

White contends under Claim 2 that various defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. (ECF No. 1-1 at 35–36). The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" Estelle v. Gamble, 429 U.S. 97, 102 (1976). A prison official violates the Eighth Amendment when he acts with "deliberate indifference" to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must satisfy both an

---

[3] LVMPD was created in 1973 when the Clark County sheriff's department merged with the city of Las Vegas police department under NRS Chapter 280. See Clark County, Nevada, Code of Ordinances 2.60.010–2.60.030 (1981).

objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." <u>Snow v. McDaniel</u>, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds by <u>Peralta v. Dillard,</u> 744 F.3d 1076, 1083 (9th Cir. 2014).

For the first prong, "the plaintiff must show a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain." <u>Jett v. Penner</u>, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal quotations omitted). For the second prong, he must show "(a) purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." <u>Id.</u> This requires that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer</u>, 511 U.S. at 837; <u>see also</u> <u>Peralta</u>, 744 F.3d at 1086.

When a prisoner claims deliberate indifference based on a delay in providing medical treatment, he must show that the delay led to further harm. <u>See Shapley v. Nev. Bd. of State Prison Comm'rs</u>, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference"). Prison officials who know of a substantial risk to an inmate's health and safety are liable only if they responded unreasonably to the risk, even if the harm ultimately was not averted. <u>Farmer</u>, 511 U.S. at 844. Thus, if a prison medical official is denied resources necessary to provide medical care, that person cannot be said to have punished the inmate and cannot be held liable under the Eighth Amendment. <u>Peralta</u>, 744 F.3d at 1084; <u>see also Patkins v. Tran</u>, No. 15-CV-05073-EMC, 2017 WL 2861914, at *7 (N.D. Cal. July 5, 2017) (holding that because prison policy concerning allowable dental services for prisoners did not include bridges, the law did not impose liability for damages on dentist for not providing a replacement bridge for inmate).

Because deliberate indifference is required, a complaint that a medical provider inadvertently or negligently misdiagnosed or treated a medical condition is **not** sufficient to state a valid claim under the Eighth Amendment as "[m]edical malpractice does not become a

1  constitutional violation merely because the victim is a prisoner." <u>Estelle</u>, 429 U.S. at 106. Even

2  gross negligence is insufficient to establish deliberate indifference to serious medical needs. <u>See</u>

3  <u>Toguchi v. Chung</u>, 391 F.3d 1051, 1060 (9th Cir. 2004).

4      A mere difference of opinion between medical professionals concerning the appropriate

5  course of treatment, or a difference of opinion between the prisoner-patient and the medical-care

6  provider, also cannot support a claim for deliberate indifference to serious medical needs[4] unless

7  the prisoner can "show that the course of treatment the doctors chose was medically unacceptable

8  under the circumstances" and "that they chose this course in **conscious** disregard of an excessive

9  risk to [the prisoner's] health." <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996) (emphasis

10  added). But if a defendant chooses to override medical recommendations and deny a person

11  medical care solely based on an administrative policy that he knows would require an inmate to

12  suffer medically (and not based on differences of medical opinions or because medical care was

13  not medically indicated or would be unhelpful) there may be deliberate indifference. <u>Colwell v.</u>

14  <u>Bannister</u>, 763 F.3d 1060, 1068 (9th Cir. 2014).

15      Advancing a policy that requires subordinates to commit constitutional violations cannot

16  be sufficient for § 1983 liability, however, if the policy does not proximately cause the plaintiff's

17  constitutional harm. <u>OSU Student All. v. Ray</u>, 699 F.3d 1053, 1076 (9th Cir. 2012). A plaintiff

18  cannot plead a colorable claim on such a theory by merely offering the conclusory statement that

19  there is a policy. <u>Ashcroft</u>, 556 U.S. at 680–81. Rather, the plaintiff must plead facts that show that

20  there is a policy, what the policy is, and what role each defendant played in creating that policy.

21  <u>Id.</u> at 678–81.

22      Finally, because "[t]here is no respondeat superior liability under [§]1983,"[5] every target

23  of a prisoner civil-rights claim must have personally participated in the constitutional deprivation.

24  <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional

25  violations of his subordinates if the supervisor participated in or directed the violations, or knew

26

27      [4] <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989); <u>Franklin v. State of Or., State Welfare</u>
   <u>Div.</u>, 662 F.2d 1337, 1344 (9th Cir. 1981).

28      [5] <u>Ashcroft</u>, 556 U.S. at 676 (holding that "[b]ecause vicarious liability is inapplicable to
   *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through
   the official's own individual actions, has violated the Constitution").

1    of the violations and failed to act to prevent them." Id. "A showing that a supervisor acted, or failed

2    to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is

3    sufficient to demonstrate the involvement—and the liability—of that supervisor." Starr v. Baca,

4    652 F.3d 1202, 1206–07 (9th Cir. 2011). "Thus, when a supervisor is found liable based on

5    deliberate indifference, the supervisor is being held liable for his or her own culpable action or

6    inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates.

7    Id. at 1207. Therefore, "a plaintiff may state a claim against a supervisor for deliberate indifference

8    based upon the supervisor's knowledge of and acquiescence in unconstitutional conduct by his or

9    her subordinates." Id. There must be a sufficient causal connection between the supervisor's

10   wrongful conduct and the Constitutional violation. Id.

11                      **1.      Medical care at HDSP from March to August 2019**

12          According to the allegations, when White arrived at HDSP he self-reported to Dr.

13   Manalang at intake that he needed Gabapentin to treat his seizures. The Court infers that Mr.

14   White's medical records were made available to Dr. Manalang at the time of Mr. White's intake

15   and that those record indicate that Plaintiff had previously taken Gabapentin to treat his seizure

16   disorder.

17          White had three seizures at HDSP before he was transferred to ESP in August 2019. No

18   one witnessed White's first seizure. Dr. Bryan told White when he saw him after the first seizure

19   that, because his medical history included reports that he had been caught diverting his Gabapentin

20   medication to other inmates and claims that he was allergic to other anticonvulsant drugs, he would

21   need to be seen by prison staff having a seizure to be prescribed Gabapentin. Dr. Bryan ordered

22   that White's blood levels be checked if he reported another seizure.

23          When White had another seizure two weeks later, he was taken to the clinic where his

24   blood was checked, and he was prescribed Gabapentin. White had another seizure four days later;

25   he had not yet received Gabapentin. White was examined by Dr. Manalang the same day and given

26   Gabapentin and ordered to have his blood checked in two weeks. When White had a seizure before

27   that deadline, Dr. Manalang increased White's Gabapentin prescription to 1,200 mg BID. White

28   was transferred to HDSP a week later.

When White arrived at HDSP, he self-reported to Dr. Manalang at intake that he needed Diflucan and a wrist brace to treat his fungal infection. The Complaint also alleges that R. Clay had filled out a form indicating that a left wrist brace was part of Plaintiff's possessions noted in the transfer to HDSP. White's self-reporting, plus any evidence in the medical record along with the brace being noted as part of his possessions is enough to state a plausible allegation that Dr. Manalang should have been on notice of the condition at intake and was deliberately indifference to this condition.

Based upon these facts, the Complaint states plausible allegations that Drs. Manalang and Bryan either knew or should have known that White had a serious need for Gabapentin and that Dr. Manalang either knew or should have known of Plaintiff's fungal infection at intake. The claims for Eighth Amendment deliberate indifference against Defendant Dr. Manalang and Dr. Bryan can proceed for this time-period with respect to Dr. Manalang's actions upon intake and Dr. Bryan's initial evaluation of Plaintiff.

### 2.      Medical care at ESP from August to October 2019

According to the allegations, White was without his wrist brace for 17 days after his transfer from HDSP to ESP. He complained about the issue but does not allege who he complained to. White filed a grievance about the issue and received his brace six days later. These allegations are not sufficient to state a colorable claim that any Defendant was deliberately indifferent to his need for a brace.

White did not receive any of his seizure medication for two days shortly after his arrival at ESP, and he had a seizure, which he reported by medical kite and his mother complained about to warden Gittere and nurse Carpenter. White received only one dose of Gabapentin the next day and it was a reduced amount—900 mg instead of the 1,200 mg that Dr. Manalang had prescribed. Two days later, Martin prescribed White Gabapentin at 1,200 to 1,500 mg BID daily, discontinued White's Keppra prescription because White was refusing that medication and referred White to see Dr. Hanf for his fungal infection. Minev, Wickham, and Hager overrode Martin's order to increase the dose Gabapentin. Dr. Hanf recommended that White be referred to see a hand surgeon for his fungal infection. The URP approved the referral in September 2019.

1   White was told that under NDOC policy, he needed a neurologist's order to obtain

2   Gabapentin in the dosages that Dr. Manalang and Martin prescribed. White appealed this decision,

3   providing reports from neurologists Drs. Chang and Wangswana, but the decision stood. So Dr.

4   Hanf recommended that White be referred to see a neurologist about his seizures. The URP

5   approved the referral in October 2019. White was transferred to HDSP in October 2019.

6   These allegations are not sufficient to state a colorable claim that any Defendant was

7   deliberately indifferent to White's serious medical needs while he resided at ESP from August to

8   October 2019. No Defendant is identified with the failure to provide White his medications at all

9   or in the prescribed doses on several days. The factual allegations underpinning the alleged need

10  for a higher dose of Gabapentin do not amount to more than a difference of medical opinion

11  between White and his prison doctors on one hand and those doctors' administrators or supervisors

12  on the other. And the allegations show that nurse Martin, Dr. Hanf, and the URP responded to

13  White's needs. Because no other allegations are pled against them, Defendants G. Carpenter, T.

14  Hanf, and William Gittere are dismissed from the Second Amended Complaint without prejudice.

### 3.   Medical care at HDSP from October 2019 to September 2020

16  According to the allegations, shortly after White arrived at HDSP in October 2019, his

17  prescription for Gabapentin was increased to 1,600 mg BID after he had a violent seizure that was

18  witnessed by staff. But White was given only 1,200 mg BID. Some days HDSP was "out" of his

19  medication, so he went unmedicated. He saw neurologist Dr. Tan in January 2020 who prescribed

20  Gabapentin at a dose of 1,200 mg TID, for a total of 3,600 mg daily, and further testing. Minev,

21  Wickham, and Hager overrode Dr. Tan's Gabapentin prescription. White had at least 8 seizures

22  before Dr. Bryan increased his Gabapentin dose to 1,200 mg BID. White had seven more seizures

23  after that. It took months before White had the blood tests and MRI that Dr. Tan had ordered.

24  White was told by several members of HDSP's medical staff that their superiors—Minev,

25  Wickham, and Hager—and NDOC policy stood in the way of him receiving a therapeutic dose of

26  Gabapentin. White concludes that Faulkner and Drs. Bryan and Manalang refused to prescribe him

27  a higher dose of Gabapentin despite knowing that he needed it. But it cannot be reasonably inferred

1   from the allegations that any of these Defendants could override a decision by their superiors

2   prohibiting them from prescribing White a higher dose of Gabapentin.

3     White sustained collateral injuries during some of his seizures. Correctional officer Dvorak

4   rebuffed White's emergency grievance about possibly fracturing his arm during a particularly

5   violent seizure and did not contact medical staff. It is not clear what Dvorak knew about White's

6   injury. White concludes without facts that Dvorak did not contact medical about the emergency

7   grievance.

8     White filed numerous medical kites informing medical staff that he was continuing to have

9   seizures and was undermedicated. Nurse Faulkner responded to many of White's kites with basic

10   information like the fact that medical providers determine dosage amounts and that White was on

11   the appointment list for the provider. But Faulkner never scheduled White for a follow up with a

12   nurse or an earlier appointment with a medical provider.

13     White's allegations are sufficient to state a colorable claim that Minev, Wickham, and

14   Hager were deliberately indifferent to his serious medical needs when they (1) overrode prison

15   doctors' orders prescribing over 1,800 mg of Gabapentin daily under NDOC's policy that a

16   neurologist needed to order a higher dose and (2) overrode neurologist Dr. Tan's order prescribing

17   3,600 mg of Gabapentin daily. White's allegations are also sufficient to state a colorable claim that

18   Faulkner was deliberately indifferent to his serious medical needs when he delayed White

19   receiving medical treatment for his seizure condition and fungal infection. But White's allegations

20   fail to state a colorable claim against Drs. Bryan and Manalang and Dvorak. Claim 2, Eighth

21   Amendment deliberate indifference to serious medical needs, may proceed against Defendants

22   Minev, Wickham, Hager, and Faulkner. Because there are no other allegations pled against them,

23   Defendants Radek Dvorak, G. Bryan, and T. Manalang are dismissed from the Second Amended

24   Complaint without prejudice.

25     **F.**  **State-law tort claims**

26     White also pursues claims under state-law tort theories of negligence, defamation, and

27   intentional infliction of emotional distress. Nevada law proscribes bringing a tort action against a

28   person who is named as a defendant solely because of an act or omission relating to the public

duties or employment of an officer or employee of the State of Nevada or political subdivision unless the State or appropriate political subdivision is named as a party under NRS 41.031. Nev. Rev. Stat. § 41.0337. Normally this means that a plaintiff cannot pursue state-law tort claims in federal court against a state employee because the State of Nevada must be named as a defendant but cannot be named because the State has not waived its Eleventh Amendment sovereign immunity. See O'Connor v. St. of Nev., 686 F.2d 750 (9th Cir. 1982). But White filed this action in state court and the Attorney General for the State of Nevada removed it here—to a federal court. (ECF No. 1). The United States Supreme Court has consistently found that a state waives its Eleventh Amendment immunity when the State's attorney general voluntarily invokes a federal court's jurisdiction. See Lapides v. Bd. of Regents of Univ. Sys. of Georgia, 535 U.S. 613, 622–23 (2002) (holding that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum"). It thus appears that Eleventh Amendment immunity does not pose an obstacle to White brining state tort claims in this federal action.

The Court has supplemental jurisdiction over state claims if the state and federal claims "derive from a common nucleus of operative fact," and "are such that [the plaintiff] would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966). Here, White's remining[6] tort claims are based on the same operative facts as his claim under the Eighth Amendment for deliberate indifference to his serious medical needs, which the Court has allowed to proceed against certain Defendants. Because jurisdiction does not appear to be an issue, the Court screens White's remaining tort claims.

### 1.    Defamation

"Defamation is a publication of a false statement of fact." Pegasus v. Reno Newspapers, Inc., 57 P.3d 82, 87 (Nev. 2002). To state a colorable claim for defamation a plaintiff must show: (1) the defendant made "a false and defamatory statement" about the plaintiff (2) unprivileged publication of it to a third person, (3) "fault, amounting to at least negligence[,]" and (4) "actual or presumed damages." Id. at 90 (internal quotation omitted). According to the allegations, on four

---

[6] Recall that the Court has already dismissed the tort claims based on the theory that Defendants interfered with White's ability to access his evidence for another lawsuit.

occasions in July and August 2017, Naphcare employees Williamson, Crosby, Hall, Lim, and Lopez put reports in White's medical records that he had been caught diverting his Gabapentin medication to other inmates. (ECF No. 1-2 at 7, 40). Defendants' reports included that White had been "hoarding/cheeking" his medication and forging documents. (Id.) These entries were made while White was detained at CCDC. (Id.) White alleges that the reports are false, and the reason why he was denied Gabapentin, or a therapeutic dose of it, after he was transferred to the NDOC's custody. (Id.)

These allegations do not state a colorable claim for defamation against any Defendant. The problem is White fails to clearly allege which Defendant made which report. He simply lumps Defendants together and alleges when the false reports were made. This is not acceptable pleading. Claim 7, defamation, is therefore dismissed without prejudice. And because there are no other allegations about them, Defendants Williamson, Crosby, Hall, Lim, and Lopez are dismissed from the Second Amended Complaint without prejudice.

### 2. Negligence

To state a colorable claim for negligence under Nevada law, the plaintiff must plead true facts to show: (1) the defendant owed him an existing duty of care, (2) the defendant breached that duty, (3) "the breach was the legal cause of the plaintiff's injuries, and (4) the plaintiff suffered damages. Foster v. Costco Wholesale Corp., 291 P.3d 150, 153 (Nev. 2012). White broadly alleges under Claim 8 that Defendants owed him several duties of care, e.g., "to provide adequate, responsive and competent medical attention," "to not interfere with is prescribed medical care on non-medical basis." (ECF No. 1-2 at 41). And he concludes that the remaining elements of this claim are met. (Id.)

These allegations do not state a colorable claim for negligence against any Defendant. The problem is that White's claim is devoid of any facts and is based entirely on conclusory statements. White expects the reader to pull the facts needed to state the elements for this claim from his 27-page fact section. He therefore fails to clearly state which Defendant owed him which duty of care. And he does not clearly allege breach of any duty. This is not acceptable pleading. Claim 8, negligence, is therefore dismissed without prejudice.

1

### 3.   Intentional infliction of emotional distress

2   To state a colorable claim for negligence under Nevada law, the plaintiff must plead true

3   facts to show (1) extreme and outrageous conduct with either the intention of, or reckless disregard

4   for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme or emotional

5   distress, and (3) actual or proximate causation. <u>Star v. Rabello</u>, 625 P.2d 90, 91–92 (Nev. 1981).

6   White broadly alleges under Claim 9 that each act and omission by Defendants pled in his fact

7   section was done for the purpose of causing him emotional distress or reckless disregard for that

8   result, was outrageous, and caused him to experience "pain, sufferings, and distress." (ECF No. 1-

9   2 at 41–42.

10   These allegations do not state a colorable claim for intentional emotional distress against

11   any Defendant. White does not clearly identify which act or omission by which Defendant he

12   contends constitutes extreme and outrageous conduct. He pleads no facts to show that any act or

13   omission was done with the purpose of causing extreme emotional distress or in reckless disregard

14   of that outcome. And White does not plead any facts that he suffered extreme or emotional distress.

15   So Claim 9, intentional infliction of emotional distress, is dismissed without prejudice.

16   ### IV.   INMATE EARLY MEDIATION PROGRAM

17   The District of Nevada has the Inmate Early Mediation Program ("IEM"), which is

18   designed to attempt to save resources by referring the parties in some prisoner civil-rights cases to

19   mediation. Of course, defendants in such cases have the right not to make any settlement offers,

20   and plaintiffs have the right to not accept settlement offers. And the Court may choose not to refer

21   a case to mediation to preserve limited judicial resources. Given the unusual procedural posture of

22   this case—the Court has determined that it would not be a productive use of its resources to set

23   this case for a mediation session. The Court instead puts this case on a standard litigation track.

24   ### V.   SERVICE OF SECOND AMENDED COMPLAINT

25   The Court has now screened the Second Amended Complaint; permitted White to proceed

26   on Claim 2 alleging medical deliberate indifference against Defendants Minev, Wickham, Hager,

27   and Faulkner; and decided not to send this case to the IEM program. The Second Amended

28

1   Complaint must be served on Minev, Wickham, Hager, and Faulkner so they can answer or

2   otherwise respond to it.

3          Defendants informed the Court in their statement of removal that Minev was served

4   through the U.S. Mail on October 5, 2020, Wickham accepted service through counsel on June 4,

5   2021, and Faulkner accepted service through counsel on November 18, 2020. (ECF No. 4 at 2).

6   Defendants also confirmed in their statement that the "NDOC Defendants[,]" which includes

7   Minev, Wickham, and Faulkner, filed their answer to the Second Amended Complaint on May 27,

8   2021. (Id. at 1–2). And the Office of the Nevada Attorney General has appeared in this Court on

9   behalf of Minev, Wickham, and Faulkner but not on behalf of Hager. (See ECF No. 4 at 1). It thus

10  appears that the only remaining Defendant who has not been served with process or appeared in

11  this action is Defendant Robin Hager. So the Court will direct White later in this order to serve

12  Defendant Hager with process and provide instructions to do so.

13  **VI.    PENDING MOTIONS**

14         The Court now turns its attention to the many motions that White has filed in this lawsuit.

15  First are White's motions asking the Court to:

16         • Order Defendant Johnson to provide Defendant Asimidakis's address to the Court

17            for service by the U.S. Marshal. (ECF No. 5);

18         • Strike answers that Defendants Nash, Hubbard-Pickett, Graham, and Wickham

19            filed below and to enter default against them and Carpenter and Asimidakis. (ECF

20            No. 6);

21         • Order Defendant Graham to show cause why he should not return White's

22            documents and be ordered to refrain from further obstructing White's efforts to

23            prosecute this action. (ECF No. 7);

24         • Expedite his pending appointment with a physician and transfer to another facility.

25            (ECF No. 8);

26         • Refer this case to the Court's IEM program, or not. (ECF No. 9);

27         • Order Defendant Johnson to show cause for his unspecified conduct toward White.

28            (ECF No. 25);

- Provide courtesy copies of motions. (ECF Nos. 29, 30, 31); and
- Sanction defendants and issue an order resolving his motion at ECF No. 9 whether to refer this case to the IEM program. (ECF No. 53).

The Court denies all of these motions for one or more of the following reasons: (1) the relief requested has been mooted by the screening of the Second Amended Complaint; (2) the requested relief is not properly supported by points and authorities as required by Local Rule 7-2(a), which constitutes a consent to its denial under Local Rule 7-2(d); or (3) the concerns raised in the motions are outweighed by the public policy favoring disposition of cases on their merits.

White also moves to extend his copy work limit by $150. (ECF No. 19). An inmate has no constitutional right to free photocopying. Johnson v. Moore, 948 F.2d 517, 521 (9th Cir. 1991). Pursuant to NDOC administrative regulation 722.01(7)(E), inmates "can only accrue a maximum of $100 debt for copy work expenses for all cases, not per case." In this district, courts have found that they can order a prison to provide limited photocopying when it is necessary for an inmate to provide copies to the court and other parties. See Allen v. Clark Cnty. Det. Ctr., 2:10-CV-00857-RLH, 2011 WL 886343, *2 (D. Nev. Mar. 11, 2011). In this case, the Court grants White's request to extend his copy work account limit by another $40.

What remains are White's emergency motion for a temporary restraining order, emergency motion for a preliminary injunction, motion for an order directing the NDOC to provide his mental-health records under seal, emergency motion for Defendants to show cause why case-ending sanctions should not issue, and motion for an order directing the NDOC to provide his complete medical file. (ECF Nos. 12, 13, 72, 74, 76). The Court will not resolve these motions in this order; it will resolve them later. White is cautioned that he should not continue to file motions about the matters at issue in any of these motions.

## VII.    CONCLUSION

IT IS THEREFORE ORDERED that:

- Claim 1, First Amendment retaliation (evidence interference);
- Claim 3, 42 U.S.C. § 1985 civil conspiracy (evidence interference);

- Claim 4, 42 U.S.C. § 1986 failure to prevent civil conspiracy (evidence interference);
- Claim 6, conversion of property;
- Claim 7, defamation (evidence interference);
- Claim 8, negligence (evidence interference); and
- Claim 9, intentional infliction of emotional distress (evidence interference)

are DISMISSED WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND. If White wants to pursue the matters at issue in these claims, he must file them in a new action.

IIT IS FURTHER ORDERED that:

- Claim 1, First Amendment retaliation;
- Claim 3, 42 U.S.C. § 1895 civil conspiracy;
- Claim 4, 42 U.S.C. § 1986 failure to prevent civil conspiracy;
- Claim 7, defamation;
- Claim 8, negligence; and
- Claim 9, intentional infliction of emotional distress

are DISMISSED WITHOUT PREJUDICE in all other respects.

IT IS FURTHER ORDERED that Claim 2, Fourteenth Amendment conditions of confinement as to Defendants Naphcare (medical care); and Claim 5, discrimination under the ADA, are DISMISSED WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Claim 2, Fourteenth Amendment conditions of confinement (medical care) MAY PROCEED against ONLY R. Clay and Claim 2, Eighth Amendment deliberate indifference to serious medical needs MAY PROCEED against ONLY Defendants Michael Minev, Theresa Wickham, Robin Hager, and Bob Faulkner and Defendants Drs. Manalang and Bryan as to the period from March to August 2019.

IT IS FURTHER ORDERED that Defendants Sia Asimidakis, Jaques Graham, Manuel Portillo, and Owens are DISMISSED from the Second Amended Complaint WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND.

IT IS FURTHER ORDERED that Defendants R. Curry; Naphcare, Inc.; Radek Dvorak; T. Hanf; G. Carpenter; William Gittere; Brian E. Williams, Sr.; Monique Hubbard-Pickett; Calvin Johnson; Jennifer Nash; Charles Daniels; Jeremy Bean; Larry Dean Williamson; Holly Crosby; Larry Hall; Rhys Lim; Eric Lopez; and Scott Mattison are DISMISSED from the Second Amended Complaint WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that White's motions for various relief (ECF Nos. 5, 6, 7, 8, 9, 25, 29, 30, and 31) are DENIED.

IT IS FURTHER ORDERED that White's motion to extend his copy work limit (ECF No. 19) is GRANTED IN PART. The Nevada Department of Corrections shall extend White's prison copy work limit by another $40.

The Clerk of Court is directed to:

- FILE the Second Amended Complaint (ECF No. 1-2) and SEND White a courtesy copy;
- DISMISS all Defendants **EXCEPT** Ryan Clay, Dr. Rio Manalang, Dr. Gregory Bryan, Michael Minev, Theresa Wickham, Robin Hager, and Bob Faulkner;
- ISSUE SUMMONS for Defendant Robin Hager;
- DELIVER the summons, a copy of the Second Amended Complaint (ECF No. 1-2), and a copy of this order to the U.S. Marshal for service; and
- SEND White one USM-285 form.

Finally, IT IS FURTHER ORDERED that White:

- Will have 30 days from the date of this order to FURNISH the required USM-285 form with relevant information as to Defendant Robin Hager on the form to the U.S. Marshal;
- Will have 20 days after receiving a copy of the USM-285 form showing whether service has been accomplished on Defendant Hager from the U.S. Marshal, to FILE a notice with the Court identifying if Defendant Hager was served. If Defendant Hager was not served and White wishes to have service attempted again, then he must file a motion with the Court identifying specifying a more detailed name

and/or addresses for Defendant Hager, or whether some other manner of service should be attempted; and

- Will serve upon Defendants or, if an appearance has been entered by counsel, upon their attorneys, a copy of every pleading, motion or other document submitted for consideration by the Court. If White electronically files a document with the Court's electronic-filing system, no certificate of service is required. Fed. R. Civ. P. 5(d)(1)(B); Nev. Loc. R. IC 4-1(b); Nev. Loc. R. 5-1. However, if White mails the document to the Court, he shall include with it a certificate stating the date that a true and correct copy of the document was mailed to the defendants or counsel for the defendants. If counsel has entered a notice of appearance, White shall direct service to the individual attorney named in the notice of appearance, at the physical or electronic address stated therein. The Court may disregard any document received by a district judge or magistrate judge that has not been filed with the Clerk, and any document received by a district judge, magistrate judge, or the Clerk that fails to include a certificate showing proper service when required.

DATED: January 20, 2022.

_____
RICHARD F. BOULWARE, III
UNITED STATES DISTRICT JUDGE