UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| TONEY WHITE,<br><br>    Plaintiff,<br><br>    v.<br><br>GREGORY BRYAN, *et al.*,<br><br>    Defendants. | Case No. 21-cv-01259-RFB-MDC<br><br>**ORDER** |

### I. INTRODUCTION

Before the Court is Defendants' Motion to Dismiss Robin Hager from the Complaint (ECF No. 254). For the following reasons, the Court denies the motion.

### II. RELEVANT PROCEDURAL BACKGROUND

Plaintiff filed the initial complaint in the Eight Judicial District Court, County of Clark on September 16, 2020 (A-20-813136-C). On July 2, 2021, Petition for Removal from the Eighth Judicial District Court was filed by Defendants. ECF No. 1.

On August 11, 2021, Plaintiff filed an Emergency Motion for Temporary Restraining Order and Emergency Motion for Preliminary Injunction by Plaintiff. On October 19, 2021, the Court ordered that NDOC Defendants confirm via notice the date and time of Plaintiff's follow-up neuro appointment. NDOC Defendants were also ordered to file notice, in camera, under seal, as to why Plaintiff may not retain his anti-seizure medication. NDOC Defendants were also ordered to file with the Court every time Plaintiff received his anti-seizure medication with dosage and time administered. ECF No. 39.

On September 26, 2022, the Court granted Plaintiff's requests for appointment of counsel (ECF No. 113 and ECF No. 170) and referred the matter to the Pro Bono Program. The case was stayed. On January 3, 2023, the Court lifted the stay and directed the parties to meet and submit a proposed six-month discovery plan. ECF No. 220. On January 20, 2023, the Court granted the Discovery Plan and Scheduling Order with Discovery due by 7/20/2023 and Motions due by 9/19/2023. ECF No. 223. On September 14, 2023, the Court denied several motions related to discovery disputes without prejudice in light of the recent appointment of counsel. ECF No. 247. On November 21, 2023, the Magistrate Court granted a Stipulation for Extension of Time (ECF No. 251) with Discovery due 6/24/2024, Motions due 8/26/2024, and Proposed Joint Pretrial Order due 9/26/2024. ECF No. 252. On November 29, 2023, the Court denied several discovery related motions that had been filed by Plaintiff *pro se* (pre-appointment of counsel) as moot in light of newly appointed counsel and extended discovery deadlines. ECF No. 253. On December 5, 2023, Defendants filed a Motion to Dismiss. ECF No. 254. It was fully briefed on January 22, 2024.

On June 17, 2024, the Court held a hearing on the motion to dismiss, and also heard arguments related to the motion to extend discovery deadlines and the stipulated confidentiality agreement. The Court granted the stipulation to extend discovery to November 21, 2024, which also stays discovery against Hager until the motion to dismiss is resolved. However, the Court denied the stipulated confidentiality agreement and protective order, finding that any restrictions that would prevent Mr. White from retaining copies of his relevant and material medical records in his cell runs contrary to NDOC regulations AR 722.04 and AR 711, and undermines his right to litigate his claim, and thus conduct and access discovery, without active interference. The Court took the arguments related to the motion to dismiss under submission. This Order follows.

### III.     FACTUAL ALLEGATIONS

The following facts are drawn from the Second Amended Complaint ("SAC"). The Court incorporates by reference the factual allegations set forth in its Screening Order.

White was in a car accident in 1989 that caused severe head trauma and left him with life-long seizures. White's seizures were largely controlled with an 1,800 milligram ("mg") dose of Gabapentin given twice a day for a daily total of 3,600 mg of that anticonvulsant drug. This course

of treatment was prescribed for White by Celia H. Chang, M.D., a neurologist at U.C. Davis, and by neurologist Miracle Wangswana, D.O., in July 2004 and March 2018.

White was arrested and detained at CCDC pending trial. On July 31 and August 1, 4, and 14, 2017, when White was detained at CCDC, several prison medical staff noted that White had been "hoarding/cheeking" and otherwise "not consuming his medications" and forging medical documents. White alleges that these accusations were false. White's Gabapentin medication was discontinued while he was detained at CCDC because of these medical notes.

In March of 2019, White was transferred from Clark County Detention Center ("CCDC") to High Desert State Prison ("HDSP"). White had his first seizure while in custody on July 20, 2019. He had a second seizure 14 days later, and a third seizure 13 days after that. Mr. White did not receive Gabapentin until he was examined by Dr. Manalang after the second seizure. After the third seizure, Dr. Manalang increased White's Gabapentin dosage to 1,200 mg to be taken by mouth twice a day.

After these three seizures, Mr. White was transferred to ESP on August 24, 2019. White did not receive his seizure mediations on September 4 and 5, 2019, and had a fourth seizure. He submitted a medical kite and his mother complained about this to Warden Gittere and nurse Carpenter. White finally received his seizure mediations in the evening on September 6, 2019, but his Gabapentin dosage was reduced to 900 mg taken twice a day. White saw nurse practitioner Greg Martin via telemed on September 17, 2019, who prescribed Gabapentin at a dose of 1,200 to 1,500 mg to be taken twice daily ("BID"). The prescription was for a year. However, White did not receive the Gabapentin as Martin prescribed. Two days later, Dr. Hanf and ESP's Director of Nursing, G. Carpenter, told White that he was denied the increased dosage of Gabapentin that Martin had prescribed under the policy that a prisoner needed an order from a neurologist to receive a higher dose of Gabapentin. Accordingly, White submitted Drs. Chang's and Wangswana's reports to Dr. Hanf and nurse Carpenter to appeal that decision.

White had a fifth seizure on October 2, 2019, and submitted a medical kite about it. White saw Dr. Hanf and Nurse Carpenter nine days later, who told him that NDOC Medical Director Michael Minev, NDOC Chief of Nursing Theresa Wickham, and NDOC Medical Administrator

1  Robin Hager, denied Martin's order that White receive Gabapentin in dosages between 1,200 to
2  1,500 mg BID. White was informed that he needed to see a neurologist to gain approval for the
3  dosage amount he sought to be prescribed. Hanf recommended that White be referred to see a
4  neurologist, which the URP approved. White was also advised that he also needed to be seen
5  having a seizure by staff.

6  White had a sixth seizure he labels "violent" on October 15, 2019, and was transferred back
7  to HDSP the next day for trial. White also sought approval from the URP to see an outside
8  neurologist to establish a treatment plan for his seizures.

9  White had a seventh seizure he alleges was "terribly violent" on October 27, 2019, and was
10 taken to the clinic to be evaluated; it took him 30 minutes to regain consciousness. White's
11 Gabapentin prescription was increased from 900 mg twice daily to 1,600 mg twice daily. Prison
12 staff witnessed his seizure. When White received his Gabapentin on October 29, 2019, it was 1,200
13 mg, not the 1,600 mg that had been prescribed. The same day White's Gabapentin prescription
14 was reduced to 900 mg to be taken twice daily. Dr. Manalang told White on November 13, 2019,
15 that he would correct the Gabapentin dosage.

16 From November 13 to December 6, 2019, he received 1,200 mg of Gabapentin twice daily.
17 But he did not receive his medication on December 2 and 6, 2019, because it was "out." White's
18 Gabapentin prescription was then once again reduced to 900 mg to be taken twice daily.

19 White had an eighth seizure he labels "serious" on January 3, 2020. He injured his right
20 knee as a result. A week later, White was evaluated by and consulted with neurologist Dr. Evita
21 K. Tan of the Las Vegas Neurology Center. Dr. Tan prescribed Gabapentin at a dose of 1,200 mg
22 to be taken three times daily ("TID") for a total of 3,600 mg. She also ordered blood tests, an EEG
23 (electroencephalogram), and an MRI (magnetic resonance imaging). Plaintiff White alleges that
24 Minev, Wickham, Hager, Faulkner, Bryan, and Manalang refused to implement Dr. Tan's
25 treatment plan.

26 On January 24, 2020, White had a ninth seizure, which was witnessed by his cellmate, who
27 tried to summon staff, but to no avail. White submitted a medical kite about this event. White
28 submitted a medical kite on February 23, 2020, complaining of continued seizure activity because

1  he was undermedicated. Faulkner responded a month later, explaining that nurses do not
2  independently alter medical orders and concluded that White did not require a visit or follow up.
3  White submitted a medical kite five days later with the same complaint. The response was that
4  White was scheduled to see the provider and would be notified the day of his appointment. White
5  submitted a medical kite on March 2, 2020, again complaining that he was under medicated.
6  Faulkner responded on March 25, 2020, that "dosages are determined by the medical provider who
7  makes any necessary dosage adjustments." Faulkner concluded that White did not require a visit
8  or follow up.
9        White had a tenth seizure on March 8, 2020, and submitted a medical kite about it. Faulkner
10 responded on March 25, 2020, to see his prior grievance response and concluded that White did
11 not require a visit or follow up. White had a tenth, eleventh, and twelfth seizure on March 8, March
12 14, and March 24, 2020 respectively and submitted medical kites about these seizures. Faulkner
13 responded on March 25, 2020, referring to his prior grievance response and concluded that White
14 did not require a visit or follow up.
15       White had a thirteenth seizure he labels "violent" on March 27, 2020, that was witnessed
16 by his cellmate and staff and caused incontinence. White seized for 25 minutes before medical
17 staff arrived. He repeatedly and violently struck his head and face on the steel toilet and concrete
18 floor during this time. Once medical staff arrived, he left White in that state to make a phone call.
19 No treatment or monitoring was provided, and the doctor was not called.
20       White had a fourteenth seizure on March 31, 2020. He submitted a medical kite about the
21 event and complained that his back hurt and he had a persistent headache from his seizure on
22 March 27. White had his fifteenth seizure on April 8, 2020, and submitted a medical kite about the
23 event. White had a sixteenth seizure he labels "violent" on April 27, 2020, during which he struck
24 his left elbow, causing "significant swelling and potential fracturing." He filed a medical kite about
25 the event. When he heard no response by May 4, 2020, White submitted an emergency grievance.
26 Correctional officer Radek Dvorak rebuffed the emergency nature of the grievance and failed to
27 contact medical staff.
28       White had his seventeenth seizure on May 12, 2020, and submitted a medical kite about

the event. White saw Dr. Bryan six days later, who increased his Gabapentin dose to 1,200 mg BID. White received his first increased dose of Gabapentin the morning of May 22, 2020, but did not receive any Gabapentin that evening.

White had seven additional seizures on June 21, June 29, July 6, July 10, July 15, July 16, July 25, and July 30, 2020, and submitted medical kites about these medical events. He submitted a medical kite about each separate event. On July 15, 2020, White's blood was drawn for testing as ordered by Dr. Tan five months earlier.

### IV. LEGAL STANDARD

An initial pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). The court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In ruling on a motion to dismiss, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." Faulkner v. ADT Sec. Servs., Inc., 706 F.3d 1017, 1019 (9th Cir. 2013) (citations omitted). To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must do more than assert "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . . ." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, a claim will not be dismissed if it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," meaning that the court can reasonably infer "that the defendant is liable for the misconduct alleged." Id. at 678 (internal quotation and citation omitted). The Ninth Circuit, in elaborating on the pleading standard described in Twombly and Iqbal, has held that for a complaint to survive dismissal, the plaintiff must allege non-conclusory facts that, together with reasonable inferences from those facts, are "plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009). In addition, documents filed by a plaintiff who is proceeding without counsel must be liberally construed, and a pro se complaint must be "held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)) (citations and internal quotation marks

omitted); see also Butler v. Long, 752 F.3d 1177, 1180 (9th Cir. 2014).

## V. DISCUSSION

### A. Consideration of Motion to Dismiss

Plaintiff first argues that (1) the because the deliberate indifference claim survived IFP screening it must also survive a FRCP 12(b)(6) motion and (2) Defendants' motion should instead be construed as a motion for reconsideration or motion for relief under Rule 60. The standard for screening an *in forma pauperis* complaint under 28 U.S.C. 1915A is the same one used for Rule 12(b)(6). See Wilhelm v. Rotman, 680 F.3d 1113, 1121 (9th Cir. 2012) ("Failure to state a claim under § 1915A incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).") (quoting Weiss v. Cooley, 230 F.3d 1027, 1029 (7th Cir. 2000) ("This standard, derived from Rule 12(b)(6), also applies to the dismissal of claims under § 1915A.")).

Motions to dismiss following screening orders are disfavored, where, as here, Defendants raise arguments that were previously considered by the Court on the screening, including whether Defendant personally participated in the deprivation. Additionally, "motions to dismiss that follow screening orders frequently require the [c]ourt to repeat—often verbatim—analysis set forth in the screening order, . . Hernandez v. Aranas, No. 218CV00102-JAD-BNW, 2020 WL 569347, at *3 (D. Nev. Feb. 4, 2020). However, Defendants raise a qualified immunity argument, which was not discussed by the Court in its Screening Order, and the Court did not have Defendants' briefing at the screening stage. Therefore, the Court will consider the motion.

#### i. The Complaint states a plausible claim against Defendant Hager

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two essential elements: (1) the violation of a right secured by the Constitution or laws of the United States; and (2) that the alleged violation was committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

The Eighth Amendment prohibits the imposition of cruel and unusual punishment and "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" Estelle v. Gamble, 429 U.S. 97, 102 (1976). A prison official violates the Eighth Amendment when

1   he acts with "deliberate indifference" to the serious medical needs of an inmate. Farmer v.
2   Brennan, 511 U.S. 825, 828 (1994). "To establish an Eighth Amendment violation, a plaintiff must
3   satisfy both an objective standard—that the deprivation was serious enough to constitute cruel and
4   unusual punishment—and a subjective standard—deliberate indifference." Snow v. McDaniel,
5   681 F.3d 978, 985 (9th Cir. 2012).  To establish the first prong, "the plaintiff must show a serious
6   medical need by demonstrating that failure to treat a prisoner's condition could result in further
7   significant injury or the unnecessary and wanton infliction of pain." Jett v. Penner, 439 F.3d 1091,
8   1096 (9th Cir. 2006) (internal quotation marks omitted).

9         To satisfy the deliberate indifference prong, a plaintiff must show "(a) a purposeful act or
10  failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the
11  indifference." Id. "Indifference may appear when prison officials deny, delay or intentionally
12  interfere with medical treatment, or it may be shown by the way in which prison physicians provide
13  medical care." Id. (internal quotations omitted). This requires that the prison official "knows of
14  and disregards an excessive risk to inmate health or safety; the official must both be aware of facts
15  from which the inference could be drawn that a substantial risk of serious harm exists, and he must
16  also draw the inference." Farmer, 511 U.S. at 837; see also Peralta, 744 F.3d at 1086.

17        When a prisoner claims deliberate indifference based on a delay in providing medical
18  treatment, he must show that the delay led to further harm. See Shapley v. Nev. Bd. of State Prison
19  Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more,
20  is insufficient to state a claim of deliberate medical indifference"). Prison officials who know of a
21  substantial risk to an inmate's health and safety are liable only if they responded unreasonably to
22  the risk, even if the harm ultimately was not averted. Farmer, 511 U.S. at 844.

23        A mere difference of medical opinion cannot support a claim of deliberate medical
24  indifference. Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004). Instead, a plaintiff must
25  show "that the chosen course of treatment was medically unacceptable under the circumstances,
26  and was chosen in conscious disregard of an excessive risk to [the prisoner's] health." Id. (internal
27  quotation marks and citations omitted) (alteration in original). But if a defendant chooses to
28  override medical recommendations and deny a person medical care solely based on an

administrative policy that he knows would require an inmate to suffer medically (and not based on differences of medical opinions or because medical care was not medically indicated or would be unhelpful) there may be deliberate indifference. Colwell v. Bannister, 763 F.3d 1060, 1068 (9th Cir. 2014).

The standard for deliberate indifference is "less stringent in cases involving a prisoner's medical needs . . . because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns." Snow, 681 F.3d at 986 (internal quotations omitted). Thus, in deciding whether there has been deliberate indifference, courts "need not defer to the judgment of prison doctors or administrators." Id. at 985-86 (internal quotations omitted).

Finally, because there is no *respondeat superior* liability for a 1983 action, a defendant is liable under § 1983 "only upon a showing of personal participation by the defendant." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." Id. "Thus, when a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates. Id. at 1207.

The Court finds that the allegations in the SAC are sufficient to state a claim of deliberate indifference against Hager. First, White's seizure condition, which causes him to have dozens of seizures, including "violent" seizures where he hit his head against concrete, is an objectively serious medical need. Therefore, the SAC meets the first prong of the test for deliberate indifference. See Colwell, 763 F.3d at 1066 ("Indications that a plaintiff has a serious medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'").

Second, Hager was "deliberately indifferent" under the second prong because the SAC contains facts that plausibly show she was aware that a substantial risk of harm to White existed

and was deliberately indifferent to it. This occurred in three ways. First, Hager deliberately disregarded or overrode the prescriptions of the outside specialists. Next, she provided a prescription dosage that demonstrably failed to stop his seizures. Finally, she set a course of treatment that was not based upon medical reasons. Through these actions, Hager oversaw and implemented an ineffective treatment plan, constituting deliberate indifference. See Edmo v. Corizon, 935 F.3d 757, 792-73 (9th Cir. 2019) (finding that continuing an "ineffective treatment plan" constitutes deliberate indifference when expert evidence established that treatment was medically unacceptable).

Specifically, Hager disregarded risks to White when she, along with two other Defendants, are alleged to have overridden his Gabapentin prescription dosage or, alternatively, failed to provide him with the medication. White did not receive any of his seizure medication for two days shortly after his arrival at ESP, and he had a seizure, which he reported by medical kite and his mother complained about to Warden Gittere and Nurse Carpenter. White received only one dose of Gabapentin the next day and it was a reduced amount—900 mg instead of the 1,200 mg that Dr. Manalang had prescribed. Two days later, Martin prescribed White Gabapentin at 1,200 to 1,500 mg BID daily. Minev, Wickham, and Hager overrode Dr. Martin's order to increase the dose of Gabapentin without explanation or cause. After being transferred to HDSP, White saw neurologist, Dr. Tan, in January 2020, who prescribed Gabapentin at a dose of 1,200 mg TID, for a total of 3,600 mg daily, and further testing. Minev, Wickham, and Hager again failed to implement Dr. Tan's Gabapentin treatment plan, including the prescription, without medical justification. The Court finds that these allegations plausibly state a claim of deliberate indifference against Hager. White has specifically alleged that Hager participated in and directed his treatment during the relevant time period by making decisions regarding his treatment and directing others in their treatment of him.

Accepting the allegations as true, the delay in the correct treatment also resulted in harm. See Shapley v. Nev. Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985). White was not seen by Dr. Bryan until May 2020, four months after his appointment with Dr. Tan. During that period of time, White had at least eight seizures. Two of these seizures were violent and caused

significant bodily harm. On March 27, 2020, White seized for 25 minutes before medical staff arrived. He repeatedly and violently struck his head and face on the steel toilet and concrete floor during this seizure. Likewise, on April 27, 2020, White struck his left elbow during the seizure, causing "significant swelling and potential fracturing."

The SAC also plausibly alleges that Hager's decision to override his medical dose of Gabapentin was based on nonmedical NDOC policy, rather than a difference in medical opinion, which plausibly states a claim for deliberate indifference under Colwell, 763 F.3d at 1068. When White did not receive the Gabapentin as Dr. Martin prescribed, he was told by Dr. Hanf and ESP's Director of Nursing G. Carpenter that the denial of the increased dosage of Gabapenti was decided by Hager, Minev, and Wickham and that this denial was based upon two NDOC policies: (1) a prisoner needed an order from a neurologist to receive a higher dose of Gabapentin and (2) staff needed to observe him having a seizure prior to an increase in dosage. The record does not set forth the medical basis for these policies. Moreover, the record indicates that outside neurologists had repeatedly prescribed the higher dosage and that the prison staff and others had witnessed White's seizures.

Finally, according to the allegations, Hager "personally participated" in the decision to override the dose of Gabapentin and directed others repeatedly as to his treatment. Hager herself allegedly made these decisions and is therefore "being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates." Taylor, 880 F.2d at 1027.

### ii. Defendant Hager is not entitled to qualified immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is an immunity from suit rather than a defense to liability, and it "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the

nonmoving party, (1) whether the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id.

Under the second prong, courts "consider whether a reasonable officer would have had fair notice that the action was unlawful." Id. at 1125 (brackets in original omitted). "This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." Green v. City and Cnty. of San Francisco, 751 F.3d 1039, 1052 (9th Cir. 2014). "A Government officials' conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (brackets in original) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. Further, the right must be defined at "the appropriate level of generality . . . [and the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also Ashcroft, 563 U.S. at 741-42.

For the reasons stated above, the Court has already found that Plaintiff has alleged that Hager violated White's Eighth Amendment constitutional right to be free from cruel and unusual punishment, therefore meeting the first prong of the test. Though Defendants provide barely any argument as to the second prong of the qualified immunity test, the Court further finds that it is satisfied because the right was clearly established at the time of the violation. By the time of Hager's alleged violations, in 2019 and 2020, it was well established that defendants are deliberately indifferent when they interfere with or fail to carry out doctor's orders. Estelle v. Gamble, 429 U.S. at 105 ("intentionally interfering with treatment once prescribed"). Defendants were on notice that their acts violate the Eighth Amendment when they are aware of the extent of a plaintiff's severe symptoms, know that the course of treatment is largely ineffective, and decline to do anything more to improve the person's situation. Jett v. Prenner, 439 F.3d

1091, 1098 (9th Cir. 2006) (finding that a prison's failure to set and cast inmate's fractured thumb in spite of inmate's repeated requests and a doctor's direction to do so raised genuine dispute of fact as to whether defendants were deliberately indifferent to a serious medical need); Snow, 681 F.3d at 986 (9th Cir. 2014) (overruled on other grounds) (finding that delay, denial, and interference in providing hip surgery for two years is deliberate indifference). It was further established by 2019 and 2020 that prison staff could not deny treatment "solely because of an administrative policy, even in the face of medical recommendations to the contrary." Colwell, 763 F.3d at 1068. In fact, "this is the very definition of deliberate indifference." Id. Finally, the Ninth Circuit has also stated that "a finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law." Hamilton v. Endell, 981 F.2d 1062, 1066 (9th Cir. 1992) (emphasis in original). As Plaintiff has plausibly alleged that Hager acted with deliberate indifference to his serious medical need, this is an additional ground for denying her claim of qualified immunity at this stage of the litigation.

## VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant Hager's Motion to Dismiss (ECF No. 254) is **DENIED** without prejudice.

**DATED:** September 29, 2024.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**